## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| PAID SEARCH ENGINE TOOLS, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:07-CV-403-DF-CE |
| | § | |
| YAHOO! INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

After considering the submissions and the arguments of counsel, the court issues the following order concerning the claim construction issues:

## I.      Introduction

In this case, the plaintiff Paid Search Engine Tools, LLC ("PSET") contends that the defendants Yahoo! Inc. ("Yahoo"), Google, Inc. ("Google"), and Microsoft Corporation ("Microsoft") infringe various claims of United States Patent No. 7,043,450 B2 ("the '450 patent"). PSET's asserted claims are 1, 4, 5, 7, 10, 12, 13, 15, 18, and 22. This memorandum addresses the parties' various claim construction disputes. The memorandum will first briefly discuss the technology at issue in the case and then turn to the merits of the claim construction issues.

## II.     Background of the Technology

The '450 patent is titled "Paid Search Engine Bid Management." The Abstract of the '450 patent describes the claimed invention as:

> A method and apparatus (information processing system) for overcoming deficiencies and inefficiencies in the current paid search engine keyword bidding market, by providing keyword bidders with information they need to better optimize their use of paid search engines. The system accumulates bid amounts for a plurality of target keywords at one or more paid Internet search engines, and presents the bid amounts to a user, enabling the user to evaluate and optimize bids on those keywords. The system also presents bid amounts for a keyword at one or more paid Internet

search engines, in a manner highlighting one or more selected bid amounts of interest to a potential bidder. This permits a bidder to identify the bidder's own bid, and/or to identify a differential in bid amounts that indicates an opportunity for bid optimization. The system further monitors keyword bids at one or more paid Internet search engines to identify bid changes of interest to a potential bidder.

An example of PSET's bid display screen is shown below:

### Keyword report for www.gardens-alive.com

A yellow row indicates that www.gardens-alive.com was NOT found in the first 20 results for that keyword.
A Red $ indicates that www.gardens-alive.com was found in that position for that keyword.

| Keyword | Views | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| beneficial insect | 69 | $0.06 | $0.05 | $0.05 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| cover crop | 43 | $0.03 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| earth friendly product | 19 | $0.05 | $0.03 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| environment | 6758 | $0.65 | $0.64 | $0.62 | $0.56 | $0.52 | $0.47 | $0.45 | $0.30 | $0.26 | $0.24 | $0.22 | $0.20 | $0.20 | $0.20 | $0.16 | $0.15 | $0.14 | $0.14 | $0.00 | $0.00 |
| fertilizer | 1518 | $0.49 | $0.48 | $0.46 | $0.45 | $0.40 | $0.37 | $0.36 | $0.35 | $0.27 | $0.25 | $0.24 | $0.23 | $0.20 | $0.18 | $0.17 | $0.15 | $0.14 | $0.10 | $0.10 | $0.07 |
| flower gardening | 473 | $0.29 | $0.29 | $0.28 | $0.27 | $0.25 | $0.23 | $0.21 | $0.17 | $0.15 | $0.15 | $0.12 | $0.10 | $0.07 | $0.06 | $0.05 | $0.05 | $0.05 | $0.00 | $0.02 | $0.00 |
| garden | 11233 | $0.86 | $0.85 | $0.84 | $0.82 | $0.80 | $0.77 | $0.73 | $0.68 | $0.67 | $0.66 | $0.60 | $0.53 | $0.50 | $0.39 | $0.36 | $0.35 | $0.35 | $0.35 | $0.31 | $0.30 |
| garden alive | 290 | $0.02 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| garden pest | 438 | $0.17 | $0.16 | $0.15 | $0.15 | $0.11 | $0.10 | $0.05 | $0.02 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| garden tip | 131 | $0.15 | $0.14 | $0.14 | $0.13 | $0.08 | $0.05 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| healthy eating | 711 | $0.39 | $0.38 | $0.37 | $0.36 | $0.23 | $0.20 | $0.09 | $0.08 | $0.07 | $0.06 | $0.05 | $0.05 | $0.00 | $0.00 | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 |
| lady bug | 857 | $0.11 | $0.05 | $0.05 | $0.01 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.02 | $0.00 | $0.00 | $0.00 | $0.00 |
| lawn care | 4158 | $0.35 | $0.35 | $0.33 | $0.32 | $0.32 | $0.31 | $0.31 | $0.30 | $0.27 | $0.26 | $0.26 | $0.25 | $0.25 | $0.24 | $0.20 | $0.18 | $0.17 | $0.10 | $0.07 | $0.05 |
| lawn weeds | 122 | $0.05 | $0.04 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| mole | 1948 | $0.23 | $0.22 | $0.21 | $0.19 | $0.11 | $0.10 | $0.07 | $0.04 | $0.03 | $0.02 | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 |
| natural pest control | 153 | $0.05 | $0.05 | $0.04 | $0.04 | $0.03 | $0.03 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| organic | 787 | $0.68 | $0.60 | $0.55 | $0.51 | $0.48 | $0.35 | $0.34 | $0.25 | $0.16 | $0.14 | $0.13 | $0.13 | $0.13 | $0.12 | $0.12 | $0.11 | $0.10 | $0.10 | $0.09 | $0.07 |
| organic garden | 80 | $0.19 | $0.13 | $0.06 | $0.02 | $0.00 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| organic gardening | 1215 | $0.62 | $0.61 | $0.60 | $0.55 | $0.52 | $0.48 | $0.47 | $0.41 | $0.22 | $0.20 | $0.20 | $0.16 | $0.15 | $0.14 | $0.13 | $0.13 | $0.10 | $0.05 | $0.05 | $0.04 |
| organic lawn | 31 | $0.14 | $0.05 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| organic lawn care | 148 | $0.07 | $0.06 | $0.03 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| organics | 87 | $0.18 | $0.17 | $0.15 | $0.14 | $0.12 | $0.02 | $0.02 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.05 | $0.05 | $0.00 | $0.00 | $0.00 |
| plant disease | 313 | $0.08 | $0.07 | $0.05 | $0.04 | $0.01 | $0.00 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| slug | 563 | $0.05 | $0.03 | $0.03 | $0.02 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| snail | 1769 | $0.07 | $0.06 | $0.05 | $0.03 | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| sweet corn | 131 | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| tomato | 2445 | $0.23 | $0.19 | $0.17 | $0.15 | $0.14 | $0.10 | $0.06 | $0.05 | $0.05 | $0.03 | $0.03 | $0.02 | $0.02 | $0.01 | $0.01 | $0.01 | $0.01 | $0.01 | $0.00 | $0.01 |
| tomatoe | 150 | $0.05 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| vegetable | 2084 | $0.39 | $0.38 | $0.30 | $0.26 | $0.21 | $0.20 | $0.20 | $0.20 | $0.19 | $0.15 | $0.15 | $0.14 | $0.14 | $0.12 | $0.12 | $0.12 | $0.10 | $0.10 | $0.10 | $0.08 |
| weed control | 387 | $0.05 | $0.04 | $0.01 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| weeds | 1227 | $0.04 | $0.03 | $0.03 | $0.01 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| Add A Keyword | Go Back |
|---|---|

Claim 5 of the '450 patent, quoted below, provides an example of what is claimed in the patent:

A method of managing offers for a keyword made to a search engine, said offers identifying an amount an offeror will pay upon a searcher's use of an offeror-supplied reference located using the keyword within said search engine, comprising presenting adjacently-ranked authorized payment amounts for a plurality of target keywords at

one or more Internet search engines on a single display screen, each keyword comprising one or more words, in a manner that distinctively identifies one or more selected authorized payments of interest.

The court will now address the legal principles of claim construction and then construe the '450 patent's terms.

## III.    General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (quoting *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)).  Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1561 (Fed. Cir. 1991)).  Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  35 U.S.C. § 112; *id.* at 978.  A patent's claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.  "For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)) (emphasis added). To that end, the words used in a claim "are generally given their ordinary and customary meaning." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. *Id.* The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. The Supreme Court stated long ago that "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. *Id.* That

evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. *Id.* The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582). According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that "[t]he patent system is based on the proposition that the claims cover only the invented subject matter." *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. *Phillips*, 415 F.3d at 1322. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. *Id.* at 1317-19. In doing so, the court emphasized that claim construction issues are not resolved by any "magic formula." *Id.* at 1324. The court did not impose any particular sequence of steps for a

court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. *Id.* at 1324.

In construing the claim terms, the court must also determine whether any claim terms are invalid as being indefinite. The statutory requirement of definiteness states that the claims must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. "[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). "The definiteness requirement, however, does not compel absolute clarity. Only claims not amenable to construction or insolubly ambiguous are indefinite." *Id.* (internal quotations omitted).

## IV. Agreed Constructions

The parties have stipulated to the construction of the following terms:

"Offered prices" means "monetary amounts of offers."

"Other data" means "data other than offered prices."

## V. Disputed Terms

### A. "offer"

All of the independent claims contain the term "offer." The preambles of claims 1 and 5 both state in part, "A method of managing *offers* for a keyword made to a search engine, said *offers* identifying an amount an offeror will pay upon a searcher's use of an offeror-supplied

reference . . . ." (emphasis added). The preamble of claim 12 contains nearly identical language. The term "offer" appears nowhere in the specification; "bid" is used instead.

The plaintiff contends that "an 'offer' identifies an amount an offeror, such as an advertiser, has authorized the search engine to charge the advertiser upon a searcher's use of a link associated with a web page of the advertiser." On the other hand, the defendants argue that this term means "the amount that the offeror actually pays each time a user of the search engine uses a link supplied by the offeror." The primary difference between the proposals is whether an offer is the maximum authorized amount or the amount the offeror will actually pay. The plaintiff argues that an offer is merely an authorized amount that is automatically changed by the claimed system. According to PSET, the defendants' "will pay" construction improperly limits the invention to a static bidding system. The following limitation of claim 12 demonstrates that offers are not static bids: "implementing said change in offeror's offer . . . without further intervention of said offeror." In response, the defendants point out that the preambles of claims 1 and 12 state that the "offer identif[ies] an amount said offeror *will pay*." (emphasis added). Furthermore, the defendants argue that PSET's construction incorrectly defines "offer" the same as the term "authorization."

The court finds merit in both parties' arguments. Thus, the court defines "offer" as "a bid amount, which may be automatically raised or lowered, that an offeror pays upon a searcher's use of an offeror-supplied link."

**B.    "authorized payment amount(s)"**

Claims 1 and 5 contain the term "authorized payment amount(s)": "accumulating adjacently-ranked *authorized payment amounts* for a plurality of target keywords . . . each *authorized payment amount* representing an offeror's authorized payment for one of said keywords." ('450

8

patent, claim 1) (emphasis added).  Although the specification does not explicitly use the term "authorized payment amount," it does explain that "the invention features accumulating bid amounts for a plurality of target keywords at one or more paid Internet search engines, and presenting the bid amounts to a user."  ('450 patent, 2:34-37).  According to the plaintiff, "authorized payment amount(s)" means "an amount that an advertiser has authorized the search engine to charge the advertiser when a link associated with a web page of the advertiser is used by a searcher."  Yahoo contends that this term means "offered payment amount(s)."

Yahoo cites the following passage from the Summary of the Invention: "In specific embodiments of this aspect, bid amounts for either a single paid Internet search engine, or multiple paid Internet search engines, may be accumulated and presented.  The bids accumulated may be, e.g., the 20 largest bids for each target keyword."  ('450 patent, 2:39-43).  Thus, according to Yahoo, "[t]his supports the necessary conclusion that the 'authorized payment amounts' in claims 1 and 5 are simply the 'bid amounts' disclosed in the patents."  The court agrees and construes "authorized payment amounts" as "amounts that offerors have bid on keywords."

C.     "search engine"

The term "search engine" appears in each of the independent claims.  The preambles of claims 1 and 5 both state in part, "A method of managing offers for a keyword made to a *search engine*." (emphasis added).  The term appears throughout the specification.

PSET's proposed construction is:

One or more machines and software that use keywords to identify, from a database, results that include links associated with Internet web sites.  The search engine manages offers identifying amounts each advertiser has authorized the search engine to charge the advertiser when a searcher uses a link associated with a web page of that advertiser.  After the link has been produced by the search engine, the searcher's

9

decision to use the link determines whether the advertiser pays, i.e., "cost per click." The defendants assert the following construction: "Software that responds to a user's request for sites with one or more keywords by producing a list of links to those sites that have submitted offers for those keywords, where the links are in decreasing order of the amounts submitted by the offerors."

The first difference between the proposals centers on the inclusion or exclusion of content matching. PSET defines "search engine" to include systems that extract keywords from content pages to provide advertisements on those webpages. According to PSET, the defendants' accused "search technology scans the content of a webpage and matches keyword lists to the subject of the webpage." Thus, PSET argues that the definition of "search engine" must include content matching.

The intrinsic and extrinsic sources do not support PSET's construction. Specifically, the Background of the Invention specifies GoTo.com as a type of a search engine, but PSET does not contend that GoTo.com had any "content matching" functionality. Likewise, the extrinsic evidence does not support the plaintiff's proposed definition. One dictionary definition explains that "by creating indexes, or large databases of Web sites . . . , search engines can locate relevant Web sites when users enter search terms or phrases." Tech Terms Computer Dictionary, http://techterms.com/definition/searchengine. Thus, the court is persuaded that "search engine," as used in these claims, should be defined as a system that locates relevant Web sites when users enter search terms or phrases.

The second contested issue is whether the search engine must display links in decreasing order based upon bid amount. According to the defendants, the order in which links are displayed is based solely on the bid amount. The Background of the Invention, citing GoTo.com, explains the operation of paid search engines: "The order in which links are identified is determined by the bid

amounts provided by the sites–the site with the largest (cumulative) bid(s) for the keywords(s) identified by the user, appears first in the list of sites presented to the user, followed by the site with the second largest (cumulative) bid(s) and so on." ('450 patent, 1:47-52). But the plaintiff argues that the patent is not limited to search engines that present links solely in the order of bid amounts. According to PSET, the '450 patent does not incorporate Goto.com or any other prior art paid search engine by reference. "To incorporate matter by reference, a host document must contain language 'clearly identifying the subject matter which is incorporated and where it is to be found'; a 'mere reference to another application, or patent, or publication is not an incorporation of anything therein . . . .'" *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (quoting *In re De Seversky*, 474 F.2d 671, 674 (C.C.P.A. 1973)). PSET argues that the patent contains no clear intention to limit claim scope to only search engines that rank links by bid amount. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). The court concludes that "search engine" may include systems that include factors other than bid amounts in their rankings. Therefore, the court construes the term "search engine" as "software that responds to a user's request for sites by producing a list of links to those sites that have submitted offers for keywords."

    **D.**    **"searcher"**

The term "searcher" appears in each of the independent claims. The preambles of claims 1 and 5 both state in part, "A method of managing offers for a keyword made to a search engine, said offers identifying an amount an offeror will pay upon a *searcher's* use of an offeror-supplied reference . . . ." (emphasis added). The preamble of claim 12 contains nearly identical language. The term "searcher" is not used in the specification.

PSET proposes the following definition for "searcher":

> An Internet user who is seeking information by using a search engine or a link produced by a search engine using a keyword. The link may be presented among sponsored results on a search page or a page in the search engine's content network. The searcher may either enter the keyword in the search engine, or the search engine may extract the keyword from a content page.

The defendants contend that a "searcher" is "a user that requests sites by submitting one or more keywords to a search engine." The first difference between the proposals is whether the user is limited to submitting keywords. In the typical use of a search engine, a user types in keywords and search results are returned. But, after the user types in keywords, the search engine may suggest additional or alternative search terms that may be clicked on and submitted. A "searcher" should not be limited to merely typing in keywords, but can click on recommended search terms.

Second, the plaintiff's proposed construction covers content matching. Based on the language of the claims, a searcher must use a search engine, and a definition of the term "search engine" does not include content matching, as described by the plaintiff. As such, the court defines "searcher" to mean "an Internet user who seeks information by using a search engine or a link produced by a search engine using a keyword."

E.    "keyword"

The term "keyword" appears in each of the independent claims. The preambles of claims 1 and 5 both state in part, "A method of managing offers for a *keyword* made to a search engine, said offers identifying an amount an offeror will pay upon a searcher's use of an offeror-supplied reference located using the *keyword* within said search engine . . . ." (emphasis added). The preamble of claim 12 contains nearly identical language. "Keyword" is used throughout the specification, e.g., "[t]he paid search engine will respond to a user's request for sites with one or more keywords, by producing a list of links to those sites that have submitted bids on those

keywords." ('450 patent, 1:44-47).

PSET contends that this term means "one or more words associated with a link in a search engine." On the other hand, the defendants propose "one or more words identified to a search engine by a searcher." The plaintiff's proposal relates to its argument that searches include content matching. The claim language, read in light of the specification, counsels against this construction. The court construes "keyword" to mean "one or more words provided to a search engine by a searcher."

F.     **"target keyword"**

Claims 1 and 5 contain the term "target keyword." The '450 patent's Abstract uses "target keyword" in the following sentence: "The system accumulates bid amounts for a plurality of *target keywords* at one or more paid Internet search engines, and presents the bid amounts to a user, enabling the user to evaluate and optimize bids on those keywords." (emphasis added). According to the plaintiff, "target keyword" means "identified keyword which the advertiser has associated with the advertiser's account." The defendants contend that no construction is necessary. PSET's proposal is consistent with the term's use in the specification and claims, although the substitution of "advertiser" for "offeror" is unwarranted. Therefore, the court construes "target keyword" to mean "identified keyword which the offeror has associated with the offeror's account."

G.     **"a searcher's use of an offeror-supplied reference"**

The term "a searcher's use of an offeror-supplied reference" is found in asserted claims 1, 5, and 12. For example, claim 1 states in part that "said offers identifying an amount an offeror will pay upon *a searcher's use of an offeror-supplied reference* located using the keyword within said search engine." (emphasis added). PSET contends that "a searcher's use of an offeror-supplied

reference" means "a searcher uses a link associated with a web page identified by an advertiser." The defendants argue that no construction of this term is necessary. The court concludes that the plaintiff's proposed construction is generally correct. Therefore, the court construes this term to mean "a searcher's use of an offeror-supplied reference" means "a searcher uses a link associated with a web page identified by an offeror."

### H. "presenting"

Claims 1 and 5 contain the term "presenting": "*presenting* the adjacently-ranked authorized payment amounts . . . on a single display screen to a user." PSET's proposed construction is "presenting for display," while Yahoo proposes "displaying."

The parties dispute whether the claims actually require the information to be displayed. The plaintiff argues that displaying is optional and points out that it chose the term "presenting" not "displaying." But the claim language reads "presenting . . . *on* a single display screen," not "presenting . . . *for* display on a single screen." PSET's proposed construction changes the meaning of the claim. As noted by Yahoo, the ordinary meaning of "present" is "to show, exhibit, display." Oxford English Dictionary 397 (2d ed.). This definition of presenting is confirmed by the context of the claim language–presenting on a display is synonymous with displaying. Thus, the court construes "presenting" to mean "displaying."

### I. "relates to or affects the exposure of offeror-supplied references to searchers of a search engine"

The preamble of claim 4 states in part, "The method of claim 1 wherein said accumulating step further comprises accumulating statistic data that *relates to or affects the exposure of offeror-supplied references to searchers of a search engine . . . .*" (emphasis added). PSET's proposed

construction is "associated with or contributes to the presentation to searchers by a search engine of a link associated with a web page of the advertiser." Yahoo believes that no construction of this term is necessary.

The term "offeror-supplied reference" has been defined above. Furthermore, the court does not believe that the plaintiff's proposed construction provides any clarification for the factfinder. Thus, the court declines to construe this term.

**J.** **"identify a change in said offeror's offer of interest to said offeror"**

This term appears in claim 12: "after receipt of said authorization, monitoring keyword offers at one or more Internet search engines to *identify a change in said offeror's offer of interest to said offeror*." (emphasis added). The plaintiff's proposed construction of "identify a change in said offeror's offer of interest to said offeror" is "identify a change that can be made in an advertiser's offer and that is in accordance with the advertiser's authorization." The defendants argue that this term is indefinite because "identify" is subject to two distinct interpretations and the phrase "of interest to said offeror" is subjective.

First, the defendants contend that this term is indefinite because "identify" is susceptible to two distinct interpretations. *See MicroStrategy Inc. v. Bus. Objects Ams.*, 238 F. App'x 605, 609 (Fed. Cir. 2007). According to the defendants, in one interpretation the change is communicated to the offeror. In other words, the change is identified *to the offeror*: "identify" is the verb, "change" is the direct object, and "said offeror" is the indirect object. In the other interpretation, the change is not communicated; essentially, "to said offeror" modifies "interest." Although the term has two possible interpretations, the context of the claim indicates that the latter construction is correct. Claim 12 is directed to automatic offer management: "implementing said change . . . without further

15

intervention of said offeror." After "monitoring" and "identifying," the next step is to "implement the change." There is no need to communicate the changes to the offeror if the method automatically implements changes after identification. As such, the second interpretation is correct.

Second, the defendants argue that "of interest" is purely subjective, and thus is insolubly ambiguous. According to the defendants, those skilled in the art cannot objectively determine which changes are "of interest." *See Datamize*, 417 F.3d at 1353, 1356 (holding that "aesthetically pleasing" is indefinite because it relies on an undefined standard). But the specification provides guidance as to what criteria are "of interest." The Summary of the Invention states:

> In accordance with a third aspect, the present invention features monitoring keyword bids at one or more paid Internet search engines to identify bid changes of interest to a potential bidder.
>
> In specific embodiments of this aspect, the identified changes are those which create a differential in bid amounts meeting certain criteria. These criteria may include identifying differentials in bid amounts characteristic of bid optimization opportunities, such as differentials between bids larger than a minimum currency amount. These criteria may alternatively include identifying differentials between bids of the entity to whom the presentation is made, and bids of other parties.

('450 patent, 3:1-13). As shown in the quoted language above, the changes "of interest" are differentials in bid amounts. Thus, one of skill in the art could determine the metes and bounds of this claim language. Therefore, the court will adopt a narrowing construction and construe the term "identify a change in said offeror's offer of interest to said offeror" to mean "to identify an opportunity to change the offeror's offer based on a difference in bid amounts."

### K.    "creates a differential in offers meeting certain criteria"

Claim 13 reads, "The method of claim 12 wherein the identified change *creates a differential in offers meeting certain criteria*." (emphasis added). PSET contends that "creates a differential in

16

offers meeting certain criteria" means "creates a difference in offers satisfying specified criteria." The defendants assert that this term is indefinite due to the phrase "certain criteria."

According to the defendants, one of ordinary skill in the art cannot determine the legal boundaries of "certain criteria." But the Summary of the Invention describes "certain criteria" in the following passage:

> In specific embodiments of this aspect, the identified changes are those which create a differential in bid amounts meeting certain criteria. These criteria may include identifying differentials in bid amounts characteristic of bid optimization opportunities, such as differentials between bids larger than a minimum currency amount. These criteria may alternatively include identifying differentials between bids of the entity to whom the presentation is made, and bids of other parties.

('450 patent, 3:5-13). This passage in the specification provides guidance as to the meaning of "certain criteria," in the context of claim 13. Therefore, the court construes the term "creates a differential in offers meeting certain criteria" to mean "creates a difference between the offeror's offer and the offers of other parties that exceeds a minimum currency amount."

## L.  "in a manner that distinctively identifies one or more selected authorized payments of interest"

This term is located in claim 5: "A method of managing offers for a keyword . . . comprising presenting adjacently-ranked authorized payment amounts . . . on a single display screen . . . *in a manner that distinctively identifies one or more selected authorized payments of interest*." (emphasis added). PSET argues that "in a manner than distinctively identifies one or more selected authorized payments of interest" means "in a way that facilitates identification of one or more selected authorized payments of interest." Yahoo contends that this term is indefinite because the phrase "of interest" is purely subjective.

As discussed previously in "identify a change in said offeror's offer of interest to said

offeror," the phrase "of interest," as used in the specification, refers to differentials in bid amounts. This meaning is supported by dependent claim 8, which states, "The method of claim 5 wherein the one or more distinctively identified authorized payment amounts are associated with a differential in authorized payment amounts meeting certain criteria."

PSET's proposal does not define "of interest," but merely incorporates this phrase into its construction. Using this construction, the plaintiff could presumably argue later that any criteria is "of interest," and thus render "of interest" superfluous. *See In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1263 (Fed. Cir. 2007) (favoring claim constructions that "give[] full meaning to every word of the entire claim term"). The only objective definition of "of interest" is the specification's example of "differentials in bid amounts." Therefore, the court construes the term "in a manner than distinctively identifies one or more selected authorized payments of interest" to mean "in a way that facilitates identification of differentials in authorized payment amounts in one or more selected authorized payments."

**M.      "receiving an authorization from said offeror"**

Claim 12 contains the limitation "receiving an authorization from said offeror." The plaintiff's proposed construction is "receiving data reflecting an advertiser's permission to manage the advertiser's offer or offers." The defendants argue that this term means "receiving permission to change an offer by resubmitting a new offer to a search engine on behalf of the offeror."

The primary difference between the two proposed constructions is whether a new offer must be resubmitted or can the offer merely be managed. Step (c) of claim 12 discusses the change of offers: "implementing said change in said offeror's offer on behalf of said offeror." As the changing of offers occurs in a separate limitation (step (c)), it is improper to import this limitation into the

receiving authorization step. The manner in which the change is implemented shall be determined by construing the "implementing said change . . . " term. Therefore, the court construes "receiving an authorization from said offeror" to mean "receiving permission to change the offeror's offer or offers."

N.     **"monitoring keyword offers"**

PSET contends that the term "monitoring keyword offers" should be construed to mean "monitoring amounts advertisers have authorized the search engine to charge the advertisers upon a searcher's use of a link associated with a web page of the advertiser." The defendants believe that no construction is necessary. Because the court has already construed the term "offer," and the word "monitoring" is self-explanatory, the court agrees that no construction is necessary.

O.     **"implementing said change in said offeror's offer on behalf of said offeror"**

The term "implementing said change in said offeror's offer on behalf of said offeror" is located in the final limitation of claim 12: "*implementing said change in said offeror's offer on behalf of said offeror* based upon the previously received authorization without further intervention of said offeror." (emphasis added). The plaintiff's proposed construction is "making a change in an advertiser's offer for the advertiser." The defendants' proposed construction is "changing an offer by resubmitting a new offer to a search engine on behalf of the offeror."

The primary difference between the parties' proposed constructions is whether changes to an offer require the submission of a new offer. The defendants contend that changing an offer requires the resubmission of the offer; this argument attempts to distinguish systems that are integrated with the paid search engine. But the specification discloses bid management systems that are affiliated with the search engine. ('450 patent, 3:43-45 ("[K]eyword bid optimization services

will be provided though an Internet site either affiliated with or separate from a paid search engine . . . .")).  The defendants cite language from some of the preferred embodiments indicating that changing an offer requires submission of a new offer, e.g., "the keyword bid optimizing service may automatically *submit new bids* on behalf of the subscriber."  ('450 patent, 5:61-62) (emphasis added).  But, this language merely relates to an embodiment in which the offer management system and search engine are separate.  Nothing within the specification, nor in the claim language itself, limits the scope of "change" to withdrawing and resubmitting bids.  Therefore, the court construes "implementing said change in said offeror's offer on behalf of said offeror" as "changing offeror's offer for the offeror."

P.    **"based upon the previously received authorization without further intervention of said offeror"**

The parties' proposals for this term are identical, except that PSET substitutes "advertiser" for "offeror."  The court adopts the defendants' proposal, and as such construes "based upon the previously received authorization without further intervention of said offeror" to mean "in accordance with the previously received authorization and without the further participation of the offeror."

Q.    **Order of the claim elements of claim 12**

The claimed method of claim 12 contains three main steps: receiving an authorization, monitoring keyword offers to identify a change, and implementing a change.  The defendants contend that each step not only must be performed in order, but that each step must be performed for every cycle; the method requires an authorization from the offeror each and every time prior to monitoring, identifying, and implementing.  PSET agrees that the steps must be performed in order,

but the plaintiff argues that the first step, receiving an authorization, may occur only once, and the method may iterate through the monitoring, identifying, and implementing steps multiple times without re-authorization.

In support of their argument, the defendants note that "a method claim is directly infringed only if each step of the claimed method is performed." *Miniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008). But the plaintiff's proposed construction requires each step to be performed at least once. Furthermore, the written description explains that "if authorization has been obtained from the subscriber, the keyword bid optimizing service may automatically submit new bids on behalf of the subscriber." ('450 patent, 5:60-62). If the defendants' proposal were adopted, the system could not automatically submit new bids–the subscriber's authorization would be required for each change or new bid. Therefore, the court adopts PSET's proposed construction.

### R. "said criteria identify differentials in offers characteristic of optimization opportunities"

Claim 14 states, "The method of claim 13 wherein the *criteria identify differentials in offers characteristic of optimization opportunities*." (emphasis added). The plaintiff's proposed construction is "the specified criteria recognize differentials in offers characteristic of an opportunity to save money or time, or increase traffic or sales, in accordance with each advertiser's authorization." The defendants contend that no construction of this term is necessary.

PSET argues that "the specification clearly provides instances of optimization opportunities, such as an opportunity to save money or time, or increase traffic or sales." As discussed above for "of interest" and "certain criteria," the court will define "optimization opportunities" by reference to the specification. Thus, the court defines "said criteria identify differentials in offers characteristic

of optimization opportunities" as "the specified criteria recognize differentials in offers characteristic of an opportunity to save money or time, or increase traffic or sales, in accordance with each offeror's authorization."

**S.** **"decreasing an offer to reduce a gap between the offeror's offer and a lower offer"**

Claim 18 states, "The method of claim 12 wherein the change comprises decreasing an offer to reduce a gap between the offeror's offer and a lower offer." Both parties' proposed constructions are virtually synonymous with the claim language itself, and the court concludes that the claim language is self-explanatory. Therefore, the court will not construe this claim term.

## VI. Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the '450 patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 10th day of May, 2010.

_____

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE